COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Fulton, Friedman and Chaney
Argued at Richmond, Virginia


PLAINS MARKETING, LP

                                                    MEMORANDUM OPINION* BY
v.         Record No. 1329-22-1                     JUDGE JUNIUS P. FULTON, III
                                                    FEBRUARY 20, 2024
YORK COUNTY


FROM THE CIRCUIT COURT OF YORK COUNTY
Richard H. Rizk, Judge

Joseph M. Rainsbury (Thomas M. Wolf; Nathan R. Runyan; Miles &
Stockbridge, PC; Holland & Hart, LLP, on briefs), for appellant.

Sharon E. Pandak (James E. Barnett, County Attorney; Richard E.
Hill, Jr., Deputy County Attorney; Pandak & Taves, PLLC, on brief),
for appellee.


This appeal arises out of two real estate assessments for the years 2018 and 2020 made by

York County ("the County") for certain real property ("the property") owned by appellant, Plains

Marketing, LP ("Plains Marketing"). Plains Marketing disputes the County's assessment of the

fair market value of the real estate at issue. Plains Marketing challenged the County's valuation

in the York County Circuit Court in a bench trial. The trial court held that: (1) Plains Marketing

did not produce sufficient evidence "to overcome the presumption of correctness of [the] County

assessments under Virginia law"; (2) Plains Marketing did not produce sufficient evidence to

prove that "the assessed value of the [property at issue] . . . exceeded the property's fair market

value or that the County assessments were not uniform in their applications"; and (3) "there was

insufficient evidence to prove that the County assessments for tax years 2018 and 2020 were not

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

arrived at in accordance with generally accepted appraisal practices ("GAAP") and applicable Virginia law relating to the valuation of property." Plains Marketing appeals.

BACKGROUND

Plains Marketing operates a refined-petroleum-products terminal in York County. The facility stores and dispenses gasoline, diesel, and other refined-petroleum products for use in the local market. Plains Marketing purchased the property in 2011. Before Plains Marketing purchased the property, it was utilized as an oil refinery. After it purchased the property, Plains Marketing "dismantled much of the pipeline works, and built a complex to unload crude oil from special-purpose trains, store it in tanks, and unload it onto to ships." This type of use is typically referred to as a "terminal" in the industry.

In order to convert the property from a refinery to a transshipment facility—or "terminal"—Plains Marketing kept existing crude oil storage tanks that were already present on the property, but "removed much of the specialized refining equipment and fixtures." In addition, Plains Marketing upgraded a deep-water dock that was already present on the property. The deep-water dock can "accommodate ocean-going ships" and gives the property "access by barge to other marine terminals in the area." Further, Plains Marketing constructed a "unit train transloading facility capable of importing crude oil by rail" from other parts of the country. The property is surrounded by other undeveloped parcels owned by Plains Marketing, which buffer and screen the facility from neighboring landowners.

The County conducted biennial real estate assessments of the property for tax years 2018 and 2020. The County assessed the property at a value of $230,000,000 for tax year 2018 and a

value of $82,500,000[1] for tax year 2020.  Plains Marketing disagreed with these assessments,

thereafter appealing to the York County Board of Equalization ("the Board").  The County hired

Paul Hornsby[2] to appraise the property for the years 2018 and 2020.  Before Hornsby could

finish and submit his appraisal for the year 2018, the Board amended the assessment of the

property downward, concluding that the property was worth $62,833,000.  Based on Hornsby's

appraisals, the Board upheld the County's assessment for the year 2020, concluding that the

property for that year was worth $82,500,000.

Plains Marketing appealed the decision of the Board to the Circuit Court of York County.

During the pendency of the case, Plains Marketing provided new information to the County,

causing Hornsby to re-appraise the value of the property at $66,000,000 for the year 2020.[3]  At

trial, Plains Marketing argued that the County's assessor materially erred in valuing the property,

pointing to the unsuccessful nature of the property as an investment property.  Specifically,

Plains Marketing argued that the property was initially purchased with an eye toward taking

advantage of the "Bakken Discount,"[4] a perceived business opportunity in the oil industry.

---

[1] The County initially assessed the property at a value of $82,500,000 for tax year 2020 but amended its assessment downward to $66,000,000 after Plains Marketing provided the County with supplemental information regarding the value of the property.  The trial court ultimately found that the $66,000,000 assessment value for the year 2020 was appropriate and that Plains Marketing had not rebutted the presumption of correctness of the assessment that the County enjoys.

[2] Paul Hornsby is an "MAI, the highest designation of appraisers by the Appraisal Institute.  Hornsby has appraised 15 or 20 product terminal(s).  He has appraised the terminal parcel 8 times and inspected it 3 times."

[3] Plains Marketing argued at trial that this "re-appraisal," which came in the form of an amended answer filed 11 days before trial, "prejudiced" their case.  However, Plains Marketing does not raise that issue on appeal.

[4] The Bakken Discount was a perceived business opportunity in the oil industry stemming from the Bakken oil field, located in North Dakota and Montana.  According to Plains Marketing:

However, given the ultimate "decline" in the Bakken Discount, Plains Marketing argued that the property's business prospects "plummeted."[5]  The trial court conducted a bench trial from February 22 through 25, 2022, ultimately upholding the Board's assessments of the property for the years 2018 and 2020, in the amounts of $62,883,000 and $66,000,000, respectively.  Plains Marketing appealed.

## ANALYSIS

"The principles that guide our review of a judgment upholding a taxing authority's assessment of the fair market value of real estate are well established."  *Keswick Club, L.P. v. Cnty. of Albemarle*, 273 Va. 128, 136 (2007).  The Constitution of Virginia requires that real estate be assessed at its fair market value.  Va. Const. art. X, § 2; *see also* Code § 58.1-3201 (requiring taxing authorities to assess real property at one-hundred percent fair market value). We have defined the fair market value of a property as its sale price when offered for sale "by one who desires, but is not obliged, to sell it, and is bought by one who is under no necessity of

[i]n the mid-2000s, advances in drilling technology and hydraulic fracturing—commonly known as "fracking"—made it economically possible to extract oil from shale deposits. . . . Exploitation of the Bakken Field outpaced the growth of available means to transport the oil extracted from it.  In the latter half of the 2000s, there was insufficient pipeline capacity to take Bakken crude oil from the field to refineries.  The difficulty of transporting the Bakken crude caused its price to be substantially lower than other, more easily transported, crude oil (e.g., Brent crude from the North Sea).  Many logistics companies, including Plains [Marketing], saw this price difference (the "Bakken Discount") as a business opportunity.  If they could transport Bakken crude by rail to refineries at a cost that was less than the Bakken Discount, they could pocket the difference as profit.

[5] Specifically, Plains Marketing noted: (1) "It received its last unit train on December 9, 2015, only two years after the initial shipment"; (2) "[A]fter transshipment operations ceased in late 2015, the primary use for the [f]acility has been as a local distribution terminal for refined petroleum products"; (3) "Usage of the [p]roperty's storage facilities declined significantly after the cessation of transshipment activities"; and (4) "Dock usage, too, was severely curtailed after the cessation of transshipment activities."

having it." *Tuckahoe Woman's Club v. City of Richmond*, 199 Va. 734, 737 (1958). In making that assessment, "[e]verything which affects market value must be considered." *Arlington Cnty. Bd. v. Ginsberg*, 228 Va. 633, 641 (1985) (citing *Appalachian Elec. Power Co. v. Gorman*, 191 Va. 344, 354 (1950)).

In general, localities enjoy a "presumption of correctness" in their assessments of real property. Code § 58.1-3984(B) ("[T]here shall be a presumption that the valuation determined by the assessor or as adjusted by the board of equalization is correct."); *see also Ginsberg*, 228 Va. at 640. To rebut this presumption, the taxpayer must show, by a preponderance of evidence:

> (1) "that the property in question"
>
> > (a) "is valued at more than its fair market value" or
> >
> > (b) "the assessment is not uniform in its application"
>
> and
>
> (2) the assessment "was not arrived at in accordance with generally accepted appraisal practices, procedures, rules, and standards . . . and applicable Virginia law relating to valuation of property."

*Portsmouth 2175 Elmhurst, LLC v. City of Portsmouth*, 298 Va. 310, 321 (2020) (quoting Code § 58.1- 3984(B)). This is a "twofold burden of proof" that the taxpayer must meet when attempting to rebut the presumption of correctness. *Id.* Where the presumption of correctness applies, courts determine whether the locality committed "manifest error or disregarded controlling evidence in making its assessment." *McKee Foods Corp. v. Cnty. of Augusta*, 297 Va. 482, 498 (2019).

Before applying the presumption of correctness, however, a court must first consider "the preliminary question whether a taxing authority is entitled to the presumption of correctness." *Id.* at 499. To be entitled to the presumption, the locality, in making its assessment, must "obtain the data necessary to perform appraisals." *Keswick Club, L.P.*, 273 Va. at 140. Where the

locality fails to obtain this data or otherwise fails to properly apply "accepted valuation methods," the presumption does not apply. *McKee Foods*, 297 Va. at 498. This is because such an assessment violates "applicable Virginia law relating to valuation of property." *Portsmouth 2175 Elmhurst, LLC*, 298 Va. at 324. In such circumstances, a less stringent standard of review applies: the court reviewing the assessment must simply determine whether "the [C]ounty's assessment was erroneous." *McKee Foods*, 297 Va. at 498 (alteration in original).

The Supreme Court in *Keswick Club, L.P.* articulated the typical process that a locality undertakes in making real property assessments:

> In determining the fair market value of real estate, taxing authorities commonly use one or more of three valuation approaches: the cost approach, income approach, and sales approach. Each of these approaches utilizes different characteristics of a property to estimate fair market value, and each analyzes different elements of the property which would likely affect the price a potential buyer would be willing to pay for the property on the open market. Ideally, an appraisal should, if possible, derive its final determination of a property's value using all three approaches in order to maximize the likelihood that the valuation accurately reflects the property's fair market value.

273 Va. at 137; *see also Ginsberg*, 228 Va. at 641 (stating that "[e]verything which affects market value must be considered"); *Lake Monticello Serv. Co. v. Bd. of Supervisors of Fluvanna Cnty.*, 237 Va. 434, 439 (fair market value "focuses on those elements which influence a buyer and a seller in arriving at a sale price"). "However, with respect to any given property, a taxing authority may determine that the use of one or more [valuation] approaches is not feasible," and "the resulting assessment is [still] entitled to the presumption of validity so long as the taxing authority 'consider[ed] and properly reject[ed]' the other valuation methods." *Keswick Club, L.P.*, 273 Va. at 137 (quoting *Bd. of Supervisors of Fairfax Cnty. v. HCA Health Servs. of Va., Inc.*, 260 Va. 317, 330-31 (2000)).

*I. The "Presumption of Correctness"*

Plains Marketing argues that the presumption of correctness should not apply in this case because "the County failed to consider essential data." Specifically, Plains Marketing argues that the method utilized by Hornsby and relied upon by the County "ignore[d] market forces, ignore[d] the effect of VEPCO cancelling its contract in 2022, and ignore[d] the Facility's extraordinarily high maintenance capital expenditures." By ignoring these "critical" elements, Hornsby's determination violated Virginia law. The record belies Plains Marketing's contention that Hornsby, and by extension the County, ignored these critical factors in assessing the property at issue.

1. "Market Forces"

The market forces that Hornsby allegedly ignored in making his determination include: (1) the opening of the Bakken pipelines, thereby "virtual[ly] eliminat[ing]" the anticipated Bakken Discount, and (2) the "local [Yorktown] market for refined products." The record belies Plains Marketing's contention that Hornsby failed to consider these factors. Hornsby testified that he did consider the market that Plains Marketing and the property were operating in, the "midstream" market. Specifically, Hornsby testified that the property:

> [I]s a midstream asset that is like a distribution warehouse. . . . It's taking product in different forms, in this case rail, pipeline, vessel, and then sending it out to the ultimate consumer in different ways. . . . [The property] serves . . . those needs well[,] and not all terminals have all of those methods of transportation.

Hornsby testified that the Colonial Pipeline, the largest pipeline system for refined oil products in the United States, runs through the area. Further, in speaking about the different "markets" that the property participated in, he testified that:

> [T]here[ are] different types of markets. There are buyers and sellers for the second facility, that's a market. There's a market for the product, which I think I described it a minute ago as being more local and regional predominantly, they're using the various

modes of transportation.  Those are -- so there's different types --
different way[s] for appraisers to think about markets.

Hornsby noted that other markets in different areas of the country might be more robust; for

instance, during his deposition, conducted September 22, 2021, Hornsby acknowledged that the

facility would likely be worth more if it was located on the Gulf Coast.  Further, Hornsby also

noted that certain components of the property were not being utilized at full capacity.  However,

unlike Plains Marketing and their preferred expert, Philip Cook,[6] Hornsby noted that, while

certain components of the property were currently going unused or under used—i.e., certain oil

tanks, as well as the unit rail train that was meant to take advantage of the Bakken Discount—the

steady maintenance and upkeep of those very same features made it likely, should the market

rebound, that Plains Marketing would then be able to utilize the unused and underutilized

features of the property.  Further, Hornsby believed that the recent downturn in the market was

an anomaly and that the market would, in fact, rebound to historical norms.  In fact, he noted in

his report that "most market participants expect this [downward] trend to reverse."  Hornsby's

opinion that the market would "rebound" again, and that the unused and underutilized

components of the property would again be useful or profitable for Plains Marketing, was a

permissible opinion, supported by facts in evidence, that Hornsby, and by extension the County,

was entitled to implement in his overall assessment.  Hornsby was not required to write off any

and all value for the property based on the perceived failure of one business opportunity—the

Bakken Discount.

---

[6] Cook is an expert appraiser, hired by Plains Marketing, who prepared valuations for the
property for the fiscal years 2018 and 2020.

2.  The VEPCO Contract

Plains Marketing next points to the fact that VEPCO, the "principal customer" for the facility, "was closing its nearby plant in 2022."  Due to this anticipated closure, Plains Marketing expected it would lose the annual income stream of $1.5 million.  Yet Hornsby did not factor this future loss of income into his analysis.  Plains Marketing also argues, similarly, that "Hornsby's valuations assume that certain revenues from Plains' affiliates would continue indefinitely," even though "such revenues were not expected to continue in the future."  Regarding these anticipated future changes, however, the record demonstrates that the possibility that the nearby plant was closing down was just an assumption made by Cook, that the contract contained an annual automatic renewal clause, and that at the time that Cook evaluated the property for the years 2018 and 2020, Plains Marketing had not received a termination notice on the contract. Therefore, it was appropriate for Hornsby to factor in this future income when making his appraisal determination.[7]  Further, regarding other revenue streams, Cook acknowledged that, while the property currently catered to certain customers, the property was also available to "other customers" as well.  Therefore, it was appropriate for Hornsby to factor in the possibility that the current revenue streams would continue in more or less the same fashion.  It goes without saying that, while certain business opportunities or customers may move on, new ones may also come along in the future, as well.

3.  The Facility's Maintenance and Capital Expenditures

Finally, Plains Marketing alleges that Hornsby failed to take into account the facility's "unusually high maintenance and capital expenditures" ("maintenance capex").  Plains Marketing asserts on brief that "[r]oughly two thirds of the facility's earnings go towards

_____

[7] Plains Marketing now argues on appeal that the VEPCO contract was subsequently cancelled in 2022.  This fact, however, is immaterial to our analysis, as the assessments made by Hornsby and the County were completed prior to the cancellation of the contract.

- 9 -

maintaining the existing physical plant."  Plains Marketing points to the appraisal prepared by Cook, wherein he notes that "typical [maintenance and capital expenditures] in the . . . industry range[] from 4% to 11% of EBITDA.[8]  The subject property's [maintenance and capital expenditures] from 2014 to 2017 averaged 68.1% of EBITDA, and from 2014 to 2019 averaged 65.9%."  Cook arrived at this number by taking into account, among other costs, the costly expenditures related to repairing the dock and tank floors at the facility.  Plains Marketing asserts that Hornsby ignored these and other expenditures, not adjusting "his income, sales, or cost approaches to account for the [p]roperty's abnormally high . . . expenditures."  However, Hornsby did in fact account for the property's maintenance and capital expenditures in his analysis; he just accounted for them in a different way than Cook, utilizing a different methodology.

Hornsby testified that he believes the "EBITDA multiplier technique is more direct and equally reliable to [the] discounted cash flow analysis" that Cook prefers when accounting for maintenance capex.  Hornsby testified that because the dock and tank floors were physical assets of the property, the complete dock overhaul and replacement of tank floors were capital expenditures, not normal expenditures.  This is so because those expenditures extend the life of those features, and therefore should be considered after EBITDA, which Hornsby did.  Further, Hornsby testified that, on a "per barrel basis," he disagreed that the expenditures cited by Cook and Plains Marketing were "extremely high."  Finally, Hornsby noted in his testimony that it was appropriate to exclude certain capital expenditures when conducting a cash flow analysis of the property and that such an exclusion did not violate GAAP.  Ultimately, the conflict between Cook and Hornsby in this regard simply amounts to a disagreement as to the best technique and

_____

[8] "EBITDA" stands for "earnings before interest, taxes, depreciation, and amortization." It is used as an indicator of the overall profitability of a business.

methodology to utilize in valuing the property. Such a disagreement between the two experts does not rise to the level of rebutting the presumption of correctness that the County enjoys. *See Norfolk & W. Ry. Co. v. Commonwealth*, 211 Va. 692, 700 (1971) ("It suffices to say that the credibility of witnesses and the weight to be given to the testimony of such witnesses is a proper matter for the determination of the trier of facts. The findings of that body will be given great weight on appeal and will not be disturbed unless based on evidence which is inherently incredible or unless they are without evidence to support them.").

Because the record belies Plains Marketing's contentions in this regard, the presumption of correctness applies. We therefore turn to the merits of this case with that presumption in mind.

### II. *Professional Appraisal Standards and Virginia Law*

Plains Marketing argues that even if the presumption of correctness applies, the trial court's decision should still be reversed because the County's assessment: (1) ignored key facts and (2) was not arrived at in accordance with GAAP and applicable Virginia law relating to the valuation of property.

1. Key Facts

First, Plains Marketing argues that Hornsby "ignored key facts" in making his appraisal. Plains Marketing cites to *Ginsberg* for the proposition that "[e]verything which affects market value must be considered." 228 Va. at 641. Plains Marketing's brief, however, makes clear that this argument merely restates the same alleged errors as above, which we have already rejected as not supported by the record. Those supposed "key facts" that Hornsby ignored include: (1) the opening of the Bakken pipelines, thereby eliminating the anticipated Bakken Discount; (2) the local Yorktown market for refined products; (3) the cessation of the VEPCO contract; and

(4) the facility's unusually high maintenance capex. For the same reasons stated above, we reject Plains Marketing's contentions of error related to these factors.

2. GAAP[9] and Virginia Law

Second, Plains Marketing argues that Hornsby violated GAAP in conducting each of the three standard valuation approaches—income, sales, and cost.

i. Income Approach

With respect to the income approach, Plains Marketing argues that Hornsby used the "simplified [EBITDA] multiplier approach" instead of a "discounted cash flow" approach in violation of "industry practice." Plains Marketing asserts this was error because it is "undisputed" that GAAP require a discounted cash flow approach "when income is variable" and "the evidence show[ed] that income from the [p]roperty was not constant." Further, Plains Marketing points to Hornsby's own testimony that a prospective buyer "probably would" prepare a discounted cash flow analysis before purchasing the property. According to Plains Marketing, this violated "Virginia's willing buyer/seller standard for fair market value." *See Helmick Family Farm, LLC v. Comm'r of Highways*, 297 Va. 777, 785-86 (2019) ("We have long defined fair market value as 'the price which it will bring when it is offered for sale by one who desires, but is not obliged, to sell it, and is bought by one who is under no necessity of having it.'" (quoting *Tuckahoe Woman's Club*, 199 Va. at 737)). Further, Plains Marketing argues that Hornsby's income approach analysis also violated GAAP because he arbitrarily chose his EBITDA multiplier.

Contrary to Plains Marketing's contention, Hornsby testified that the decision to utilize the EBITDA multiplier technique is within GAAP. Assessor Kattmann testified that other Virginia assessment offices do not use the discount cash flow approach because it requires

_____

[9] "GAAP" stands for "generally accepted appraisal practices."

making too many assumptions. Further, to the extent that Plains Marketing complains about the actual multiplier number that Hornsby utilized, Hornsby testified that the EBITDA multiple that he used to value terminals accounted for normal maintenance expenditures. Non-normal expenditures that extend the life of the property—i.e., the deep-water dock and tank floor repair expenditures—should be considered after EBITDA.[10]

### ii. Sales Approach

With respect to the sales approach, Plains Marketing argues that Hornsby deviated from GAAP in four respects: (1) he "overstate[d] the amount of economically useful storage at the [p]roperty"; (2) he "ma[de] upward adjustments to value for aspects of the [p]roperty that no longer have economic relevance"; (3) his "sales methodology improperly assumes that price scales linearly with percentage of utilization"; and (4) he "failed to make adjustments to account for the [p]roperty's advanced age and abnormally high maintenance capital expenditures." We find these contentions unavailing.

"We begin with the basic principle that real property is to be assessed at its fair market value and with the 'fundamental rule that in assessing all tangible properties for tax purposes such properties should be assessed at their highest and best use.'" *Shoosmith Bros., Inc. v. Cnty. of Chesterfield*, 268 Va. 241, 246 (2004) (quoting *Norfolk & W. Ry. Co.*, 211 Va. at 699). Plains Marketing's first two contentions noted above seek to undermine Hornsby's sales approach methodology by assuming that significant portions of the property are now unusable or useless. These contentions are, however, inconsistent with our prior precedent that we value property at its highest and best use. Though some of the current tanks on the property were not being used

---

[10] Plains Marketing also points to the fact that Hornsby allegedly ignored the unusually high maintenance and capital expenditure costs as a third way that Hornsby's income approach analysis fails. However, as noted above, we have already rejected that contention as it is not supported by the record.

at the time of the valuation, the evidence showed that Plains Marketing was maintaining these tanks, and other improvements on the property, in anticipation of possible future use. Implicit in this is that the tanks are not, in fact, useless, but may be more valuable in the future, should the right business opportunity come along. Hornsby testified that it is not GAAP to ignore the total capacity in valuing the property. Hornsby's decision to incorporate the unused tanks in his valuation was therefore appropriate.

Plains Marketing does not provide support for its third contention, regarding Hornsby's "assumption" that "price scales linearly with percentage of utilization." Simply put, Plains Marketing argues that Hornsby assumes, without any reason or authority, that any change in the percentage of utilization of the property results in a corresponding equal percentage in the property's estimated sales price. For example, Plains Marketing argues that "[u]nder [Hornsby's] analysis, a 10% decrease in utilization results in a 10% decrease in estimated sales price." Plains Marketing asserts that there is "no market justification for [this] assumption." However, Plains Marketing does not cite to any authority for this contention, instead relying on its own bald assertions on brief, as well as the prepared materials of its own expert witness, Cook. Simply put, Plains Marketing states that Hornsby's "assumption" is somehow a violation of GAAP and Virginia Law. However, Plains Marketing does not cite to any GAAP principles or principles of Virginia law in asserting this contention.

An opening brief must contain "[t]he standard of review and the argument (including principles of law and authorities) relating to each assignment of error." Rule 5A:20(e). "[I]t is not the function of this Court to 'search the record for error in order to interpret the appellant's contention and correct deficiencies in a brief.'" *West v. West*, 59 Va. App. 225, 235 (2011) (quoting *Buchanan v. Buchanan*, 14 Va. App. 53, 56 (1992)). "Nor is it this Court's 'function to comb through the record . . . in order to ferret-out for ourselves the validity of [an appellant's]

claims.'" *Burke v. Catawba Hosp.*, 59 Va. App. 828, 838 (2012) (quoting *Fitzgerald v. Bass*, 6 Va. App. 38, 56 n.7 (1988) (en banc)). To the contrary, if an appellant believes "that the trial court erred, Rule 5A:20(e) require[s] him 'to present that error to us with legal authority to support [his] contention.'" *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017) (second alteration in original) (quoting *Fadness v. Fadness*, 52 Va. App. 833, 851 (2008)). Here, Plains Marketing cites no authority for its position regarding Hornsby's supposed "assumption."

Further, as stated above, the County's assessment is entitled to the presumption of correctness, and "the burden is on the taxpayer to rebut the presumption by showing by a clear preponderance of the evidence that its property is assessed at more than fair market value" and that the assessment was not arrived at in accordance with GAAP. *Shoosmith Bros., Inc.*, 268 Va. at 245. Based upon the opposing evidence offered by the County, the trial court was not without sufficient basis to find that Plains Marketing failed to meet its burden in this regard.

Regarding his fourth contention above, we have already dispelled the notion that Hornsby failed to take into account the property's age and associated maintenance capex. Therefore, Plains Marketing's argument pertaining to the sales approach also fails.

### iii. Cost Approach

With respect to the cost approach, Plains Marketing argues that Hornsby's methodology is fatally flawed because: (1) he "assumes that an investor would replace 100% of the existing capacity" of the property, were an investor to replace the facility, even though the local Yorktown market "renders more than 50% of the [property's] tank capacity superfluous"; (2) he assumes "that the total depreciation at the Facility was roughly the same as at the comparison facilities," notwithstanding that the property has its own "property-specific functional obsolescence"; (3) he valued the unit-train facility located on the property at $5 million, notwithstanding the fact that the unit-train facility was built only for the purpose of taking

advantage of the Bakken Discount and therefore is no longer useful, given the unavailability of that business opportunity; and (4) he assumed that the "land component for each comparison site was 5% of the sales price" without justifying that number, in effect "pluck[ing] a number out of the air."

Plains Marketing acknowledges the "careful and comprehensive" nature of Hornsby's analysis. As Plains Marketing notes in its brief, Hornsby reviewed other similarly situated properties to derive a value for the oil tanks on the property, and also valued other improvements maintained on the property. Hornsby then added the cost of land to that value. And finally, Hornsby factored in obsolescence and depreciation, in arriving at his final replacement cost valuation of the property.

We have already rejected Plains Marketing's contentions pertaining to the local Yorktown market and the alleged underutilization of certain aspects of the property, e.g., the unused oil tanks. Similarly, Hornsby's report makes clear that: (1) although the unit train is not being used at present, it has the capacity to be utilized in the future should the right business opportunity come along; (2) the unit train represents a significant investment from the owner of the property ($100 million); and (3) the owner, Plains Marketing, has not yet abandoned the unit rail, and still lists the unit rail as an asset in its annual 10-K disclosure to the Securities and Exchange Commission.[11] Therefore, it was appropriate for Hornsby to factor the replacement cost of the unit rail in his cost approach.

Plains Marketing also attempts to attack Hornsby's method for factoring in depreciation. However, Plains Marketing's brief on this point makes clear that the "property-specific,"

---

[11] Form 10-K is a Securities and Exchange Commission periodic report that public companies file to disclose the material results of their business operation for their past fiscal year. The Form 10-K provides a comprehensive overview of the company's condition and includes audited financial statements.

"unusual" aspects of the property that Plains Marketing complains of are actually just the same complaints stated throughout their brief, and which we have already dispelled: "[I]t is a re-purposed refinery serving as a refined-products storage terminal; it had abnormally high maintenance capital expenditures; it was operating at less-than-50% tankage capacity; and it was located in an area with a small market for refined products." As stated previously, the trial court properly rejected Plains Marketing's characterization of the evidence as such. On appeal, that determination is considered with all reasonable inferences from the evidence given to the County, the prevailing party below.

Finally, Plains Marketing attempts to attack Hornsby's use of land valuation by contending that his stated value was simply a guess. However, Plains Marketing has not offered a differing approach or a rationale for why Hornsby's appraisal was deficient in this regard, instead simply making the bald assertion on brief that Hornsby engaged in mere guesswork. This does not meet the requirements of Rule 5A:20(e), as it is Plains Marketing's duty, on brief, to point this Court to the principles of law and authorities that support their position. As stated above, the County's assessment is entitled to the presumption of correctness, and "the burden is on the taxpayer to rebut the presumption by showing by a clear preponderance of the evidence that its property is assessed at more than fair market value" and that the assessment was not arrived at in accordance with GAAP. *Shoosmith Bros., Inc.*, 268 Va. at 245. Plains Marketing has not met its burden in this regard. Therefore, its argument pertaining to the cost approach also fails.

### III. Fair Market Value and Uniformity

Plains Marketing argues that the County's assessment did not fairly estimate the property's fair market value, and that the County did not treat the property uniformly, in making its assessment. It asserts that, "[t]o the extent that Hornsby's analysis warranted the statutory

presumption of correctness under Code § 58.1-3984(B), the evidence adduced at trial rebutted it." Further, Plains Marketing asserts that, because Cook's appraisal was the only "competent evaluation[] in the record," this Court should "accept Cook's valuations."

Plains Marketing's brief in this regard rests entirely on its previous arguments, analyzed in detail *supra*, pertaining to Hornsby's supposedly deficient valuation, and why the County's assessment should not be entitled to the presumption of correctness. Those arguments include: (1) that the cessation of the VEPCO contract was imminent, (2) that the local market is depressed, (3) that Plains Marketing is no longer able to take advantage of the Bakken Discount, as it is no longer a viable business opportunity, and (4) that Hornsby did not take into account the high maintenance and capital expenditures associated with the property. We have rejected each of these contentions, and therefore cannot say that the County's assessment exceeds the fair market value of the property.

We further reject Plains Marketing's contention that Hornsby and the County "used a different mode of assessment for valuing the Property than [they] did for any other commercial property in the County." The Constitution of Virginia states that "[a]ll property, except as hereinafter provided, shall be taxed. All taxes shall be levied and collected under general laws and shall be *uniform upon the same class of subjects within the territorial limits of the authority levying the tax.*" Va. Const. art. X, § 1 (emphasis added). This principle of uniformity is also restated in Code § 58.1-3984(A).

The "dominant purpose" of the uniformity requirement "'is to distribute the burden of taxation, so far as is practical, evenly and equitably.'" *Int'l Paper Co. v. Cnty. of Isle of Wight*, 299 Va. 150, 178 (2020) (quoting *Alderson v. Cnty. of Alleghany*, 266 Va. 333, 339 (2003)). "Uniform taxation" means that "those who are similarly situated should be *treated* in a like manner by the law." *Id.* at 178 (quoting *Bd. of Supervisors of Fairfax Cnty. v. Leasco*

*Realty, Inc.*, 221 Va. 158, 166 (1980)). All steps of the taxation process, including mode of assessment, are subject to the uniformity requirement. *Id.*; *see also Norfolk & W. Ry. Co.*, 211 Va. at 695 (holding that courts enforce the uniformity requirement by "insisting upon uniformity in the mode of assessment and in the rate of taxation" (citing *Skyline Swannanoa, Inc. v. Nelson Cnty.*, 186 Va. 878 (1947))). Indeed, "[a]ny act that 'has the effect' of allowing one taxpayer to pay 'less than another [taxpayer] similarly situated might be required to pay' offends uniformity, no matter how the different treatment is effected." *Int'l Paper Co.*, 299 Va. at 182 (second alteration in original) (citing *Indus. Dev. Auth. of City of Chesapeake v. Suthers*, 208 Va. 51, 61-62 (1967)). It is this uniformity that "distinguishes taxation from arbitrary exaction." *Suthers*, 208 Va. at 62.

Here, Kattman testified that the property at issue was the only type of property "within its group." In other words, the property is the only fuel terminal within the county; it is a class of one. The Supreme Court made clear in *Orchard Glen East, Inc. v. Bd. of Supervisors of Prince William Cnty.*, 254 Va. 307 (1997), that "[t]he constitutional mandate requires uniformity in the assessment of 'properties having like characteristics and qualities, located in the same area.'" *Id.* at 313 (quoting *Lee Gardens Arlington Ltd. P'ship v. Arlington Cnty. Bd.*, 250 Va. 534, 538 (1995)). Plains Marketing does not claim that there are properties similar to its fuel terminal in York County. Instead, Plains Marketing asks this Court, as a matter of law, to broadly consider the property alike to "other income-producing propert[ies]." This, we decline to do. Plains Marketing argues that "[t]he particular nature of the business should not dictate the mode of taxation." However, the preceding 58 pages of Plains Marketing's opening brief attempted to argue the uniqueness of the property at issue in support of its contention that Hornsby's assessment was insufficient. We think the trial court was within its discretion in finding that the

property's "characteristics and qualities" were unique within York County. Therefore, Hornsby and the County did not violate Virginia law in this regard.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

*Affirmed.*